**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| VESTA LIBERTY STREET, LLC, | |
| Plaintiff, | No. 3:21-cv-1719 (SRU) |
| v. | |
| ELX, LLC, et al., | |
| Defendants. | |

## MEMORANDUM OF DECISION

This case concerns the breach of a commercial lease by the defendants ELX, LLC and Evolution Lighting, LLC. Plaintiff Vesta Liberty Street, LLC ("Vesta") brought this action against ELX seeking to recover damages for the total amount of lost rent and other costs incurred by Vesta due to ELX's breach. On December 14, 2023, I granted partial summary judgment in favor of Vesta on the question of liability for breach of contract. *See* Doc. No. 158. All that remained of the case was the calculation of damages, ELX's affirmative defense that Vesta failed to mitigate its damages, and ELX's counterclaim for unjust enrichment. A one-day bench trial was held on August 22, 2024, during which Vesta and ELX presented evidence on those issues.

For the reasons set forth below, I conclude that Vesta has failed to prove by a preponderance of the evidence that it suffered any damages for which it has not already been compensated. I also conclude that ELX proved by a preponderance of the evidence that Vesta was unjustly enriched to ELX's detriment.

This order constitutes my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.    **Background and Procedural History**

Vesta purchased property at 10-30 Liberty Street in New Haven from ELX on June 6, 2019. *See* Trial Tr., Doc. No. 174, at 14:16-18. ELX agreed to lease the same property back from Vesta for a period of ten years, and to pay rent as well as all property taxes and utilities on the property. *See* Lease Agreement, Ex. 1. Evolution agreed to guarantee the lease. *See* Guaranty Agreement, Ex. 2. About a year and a half later, on December 31, 2020, ELX notified Vesta in writing of its intent to vacate the Property, after which point it ceased paying all rent, property taxes, and utilities. *See* James Martin Email, Ex. 3; Default Letter, Ex. 4.

On February 16, 2021, Vesta commenced this action in Connecticut Superior Court against Defendants ELX and Evolution. *See Vesta Liberty Street, LLC v. ELX, LLC F/K/A Electrix, LLC et al.*, Case No. NNH-CV21-6118458-S (Conn. Sup. Ct.). Prior to removal, the state court granted Vesta a $3 million prejudgment remedy against ELX and Evolution.

On November 30, 2021, Vesta amended its complaint, naming additional Defendants, including CIBC Bank USA f/k/a The Private Bank and Trust Company ("CIBC"). CIBC removed the case to federal court on December 27, 2021. *See* Doc. No. 1. On that same day, the Defendants filed a motion for reargument and reconsideration of the prejudgment remedy in the federal case, which I granted. *See* Mot. to Reargue, Doc. No. 4; Order, Doc. No. 105. On March 20, 2023, Vesta filed a renewed motion for a prejudgment remedy, doc. no. 132, which it later withdrew. *See* Doc. No. 154.

Vesta amended its complaint on September 28, 2022. *See* Doc. No. 102. In October 2022, CIBC and ELX each filed motions to dismiss. *See* Docs. No. 110, 112. I granted CIBC's motion and denied ELX's motion. *See* Doc. No. 140. CIBC was terminated as a defendant. On May 31, 2023, Vesta filed a second amended complaint, doc. no. 141, asserting only two counts of breach

of contract, one against ELX and one against Evolution as guarantor of the contract between

Vesta and ELX.

On August 19, 2023, Vesta moved for partial summary judgment on the issue of liability

for breach of contract as well as several of ELX's related affirmative defenses. *See* Doc. No. 147.

At a hearing on that motion on December 14, 2023, I granted Vesta's motion, ruling that there

were no genuine issues of material fact and ELX had breached its lease with Vesta as a matter of

law. *See* Doc. No. 158. Thereafter, I set this matter for a bench trial on August 22, 2024. *See*

Doc. No. 163.

That bench trial lasted one day. *See* Minute Entry, Doc. No. 172. The only witness who

testified was Tanya Segel, one of the two managing members of Vesta. *See* Exhibit and Witness

List, Doc. No. 173. Forty-four exhibits were admitted. *Id.*

## II.    Standard of Review

To prevail at trial in a civil action, a plaintiff must prove each element of its claim by a

preponderance of the evidence. *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120

(2d Cir. 1970). That standard is "no more than a tie-breaker dictating that when the evidence on

an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*,

94 F.3d 53, 55 (2d Cir. 1996); *see also Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997) ("To

establish a fact by a preponderance of the evidence means to prove that the fact is more likely

true than not true.") (quoting 4 L. Sand *et al., Modern Federal Jury Instructions* ¶ 73.01, at 73-4

(1997)). At a bench trial, the district court sits as the trier of fact, and is therefore "entitled, just

as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given

witness" *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011),

and "to decide whose testimony should be credited." *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

### III.    Findings of Fact

#### A.    Sale and Lease Agreement

On June 6, 2019, Vesta and ELX entered into a sale leaseback transaction. *See* Lease Agreement, Ex. 1. Vesta purchased property located at 10-30 Liberty Street a/k/a 45 Spring Street, New Haven, CT 06519 (the "Property") from ELX, and ELX simultaneously entered into a commercial triple-net lease ("the Lease") to occupy the Property as a tenant. *Id*. Per the lease terms, ELX had an obligation to pay an annual base rent of no less than $385,722.00, plus insurance, real estate taxes, and utilities for a ten-year term. *Id.* at ¶¶ 1.02, 2.01, 3.01, 4.05, 21.02. Evolution guaranteed the Lease. *See* Guaranty Agreement, Ex. 2. The Lease Agreement also contains an article, labelled "Security Deposit", requiring ELX to deliver to Vesta a $175,000 letter of credit, which may be drawn upon by Vesta if ELX were to default on any term, covenant, or condition of the lease. *See* Ex. 1, at ¶ 6.01. Finally, the Lease states that Vesta is entitled to recover legal fees from ELX. *Id.* at ¶ 12.02.

#### B.    ELX's Breach of the Lease

On December 31, 2020, ELX notified Vesta in writing of its intent to vacate the Property. *See* James Martin Email, Ex. 3. On January 4, 2021, Vesta issued ELX a default letter, which stated that ELX had defaulted on its obligation to make a rental payment for the month of January 2021. *See* Default Letter, Ex. 4.

Prior to vacating the Property, ELX failed to remove its trade fixtures, materials, and equipment from the Property. *See* Trial Tr., Doc. No. 174, at 28:3-29:6. As a result, Vesta incurred a cleanup cost in the amount of $36,958.19. *See* Claim Summary, Ex. 15.

On January 10, 2021, the parties entered into a Possession Agreement ("the Agreement"). *See* Possession Agreement, Ex. 5. The Agreement states that "[t]he Parties agree that the Lease has been fully terminated as of the date of this Agreement," *id.* at ¶ 3, and required ELX to vacate the Property by December 31, 2020, which it did. *Id.* at ¶ 4. Additionally, the Possession Agreement contemplates that Vesta "reserves all of its rights to pursue all of its legal remedies against [ELX], and its successors, regarding its obligations under the Lease and any Guarantees." *Id.* at ¶ 8.

Also in January 2021, Vesta received $175,000.00 from CIBC Bank via a letter of credit funded by ELX. Stipulations of Fact, Doc. No. 168 at ¶ 12(A).

## C. Vesta's Efforts to Sell the Property

After ELX abandoned the Property and Vesta terminated the Lease, Vesta began cleaning out the Property. When ELX abandoned the Property, it left behind various items including equipment and machinery. *See* Trial Tr., at 28:3-29:6. From about January 10, 2021 to April 30, 2021, Vesta removed furniture, fixtures, equipment packing material, trash, chemicals, and other miscellaneous items from the property. *See* Trial Tr., Doc. No. 174, at 29:7-31:1; Stipulations of Fact, Doc. No. 168 at ¶ 12(A). Vesta's cleanup efforts included selling whatever property it could at auction, renting a forklift, hiring the services of an outside cleaning company, Pro-Klean, to remove remaining property, and hiring another outside company, GeoQuest, to remove environmentally hazardous materials. *See* Trial Tr., Doc. No. 174, at 164:17-170:14; Ex. 226 (bank account activity of Vesta, listing a $26,787.75 payment to Pro-Klean Cleaning & Restoration Services, Inc., on 6/16/2021; $8,443.32 payment to Geo Quest Inc., on 6/14/2021; and $1,727.12 payment to Susan Fiedler as reimbursement for forklift rental, on 4/8/2021).

While undergoing its cleanup efforts, on March 1, 2021, Vesta contracted with CBRE, Inc. to list the Property for sale. *See* Ex. 6. Vesta later signed two extensions of its exclusive listing agreement with CBRE that extended its agreement through December 2022. *See* Exs. 7-8. At the time that it signed its listing agreement with CBRE, Vesta did not sign any other formal listing agreement with another broker to list the property for lease, but did informally authorize Levey, Miller, Maretz LLC ("LMM"), the existing management company for the Property, to pursue potential leasing opportunities. *See* Trial Tr., Doc. No. 174, at 40:17-20. However, Vesta never placed a "for lease" sign on the property, nor did it place on online lease listing for the Property until February 2023. *See id.* at 90:5-8, 152:7-13.

Vesta had previously been in contact with a CBRE agent in August of 2020, well before ELX's breach, to discuss Vesta's then-expressed intention to sell or redevelop the Property for residential use. *See* Ex. 201. On January 4, 2021, just after ELX notified Vesta of its intent to vacate the Property, Vesta reached out via email to the same CBRE agent and stated that Vesta was "considering [its] options to sell or redevelop" because "[t]he value of the location for redevelopment as market-rate, middle market mixed-use multi-family residential remains and exceeds its value as industrial." *See* Ex. 202. On the same day, Vesta also contacted an architectural firm, Svigals + Partners ("Svigals"), via email to inquire about the firm's ability to create materials to market the Property for sale or redevelopment. *See* Ex. 203. *See also* Ex. 204 (marketing materials developed by Svigals that illustrated a proposed redevelopment plan for the Property). In that email to Svigals, Vesta again explained that "the highest and best use was not industrial," that Vesta was exploring its "opportunity to either redevelop or sell the property," and explained that when Vesta purchased the property, Vesta was "reasonably sure that the tenant would not remain for the duration of their lease." *See* Ex. 203.

Shortly after Vesta completed its cleanup of the property, in June of 2021, Vesta received five offers to purchase the Property. *See* Trial Tr., Doc. No. 174, at 50:11-15. Vesta selected a bidder, who offered to purchase the Property for $5,850,000, and entered into a purchase and sale agreement, which was ultimately terminated by the prospective buyer before the end of the due diligence process. *See id.* at 50:19-53:12; Ex. 10. Vesta later entered into two additional purchase and sale agreements with different prospective buyers in March and September of 2022, for purchase prices of $6,375,000 and $6,000,000, respectively, that also did not proceed to closing. *See* Exs. 11, 12. Each purchase and sale agreement contained provisions that barred Vesta from entering into any leases or other occupancy agreements that would survive past closing. *See* Ex. 10 at ¶ 6(a)(iv); Ex. 11 at ¶ 6(a)(iv); Ex. 12 at ¶ 6(a)(iv).

Moreover, the first purchase and sale agreement that Vesta entered into included a contingency for site plan approval. *See* Ex. 10 at ¶ 7(b)(ii)(E). In other words, the agreement was contingent on approval by the City of New Haven of a plan for redeveloping the Property. *See* Trial Tr., at 56:5-12. When that first contract was terminated, Vesta proceeded with obtaining site plan approval from the city in order to avoid that contingency in future purchase and sale agreements, and to ensure that the property was "as shovel-ready as possible for a buyer." *Id.* at 56:13-57:12. Vesta filed an application for site plan approval on January 20, 2022. *See* Ex. 206. The application, which was filed publicly, described the Property as containing "four dilapidated and vacant buildings," and described Vesta's intent to demolish the existing structures on the Property to build a 150-unit multi-family apartment complex. *See id.*; Trial Tr., at 110:16-112:24. Vesta's application for the proposed site plan was approved by city in February of 2022. *See* Ex. 207.

During the same time period—throughout 2021 and 2022—LMM also held one broker open house for both sales and leasing brokers at the Property and, even without a "for lease" sign or online lease listing, Vesta received, through LMM, leasing inquiries about the Property from prospective tenants. *See* Trial Tr., Doc. No. 174, at 63:6-64:4; 126:3-7. Those prospective tenants included a gaming center, a charter school, and a cannabis store. *See id.* at 119:5-126:7; Exs. 210-212. One prospective tenant even toured the property in September of 2022 and then emailed LMM to request a term sheet, prompting LMM to state over email that it was "deal we can make." *See* Ex. 212. That leasing inquiry, as well as all others, however, never developed into formal negotiations, and records of those inquiries were not stored in Vesta's files. *See* Trial Tr., at 197:21-25. Over two years after ELX's breach, and two years after filing this lawsuit, Vesta formally entered into a lease listing agreement with LMM on February 24, 2023. *See* Ex. 9. After signing that lease listing agreement, Vesta sent marketing materials to its LMM agent that had been developed by Svigals, which the LMM agent described in an email as being "tailored to the residential developer, who might be considering this location, rather than the industrial user." *See* Ex. 214.

In addition, in 2023 Vesta refocused its efforts at marketing the Property to developers who could construct either affordable housing or a bioscience laboratory. *See* Trial Tr., at 66:20-68:6. Those efforts ultimately resulted in interest from an affordable housing developer, which developed into a formal purchase and sale agreement between Vesta and 10 Liberty Owners, LLC that was signed in March 2024 and remains in effect today, for a sale price of $6,000,000. *See* Ex. 13.

Vesta is not seeking to recover any damages for unpaid rent or expenses beyond December 31, 2023, at which point Vesta was confident that it would soon reach an agreement to

sell the Property to the affordable housing developer that became 10 Liberty Owners, LLC. *See* Trial Tr., at 79:6-19.

## IV.    Discussion

### A.    <u>Damages</u>

Vesta claims as damages for ELX's breach the full amount of unpaid rent and other costs and expenses that ELX was obligated to pay under the Lease during the period of January 1, 2021 to December 31, 2023. The parties agree that the total amount of money that was due under the Lease during that time period and remains unpaid is $1,352,664.03, which represents $1,126,732.44 in unpaid rent; $418,467.34 in other costs, expenses, and payments; minus $175,000.00 paid from CIBC to Vesta via a letter of credit funded by ELX; and minus $17,535.75 in proceeds from the sale of personal property abandoned by ELX. *See* Stipulations of Fact, Doc. No. 168 at ¶ 12(A); Ex. 5; Trial Tr., Doc. No. 174, at 164:17-25. ELX stipulated to the amount of unpaid rent and expenses, but does not acknowledge liability for that amount. *See id.* Vesta claims that it is due that entire amount of money, while ELX claims that it has already overcompensated Vesta for its recoverable damages and that Vesta was unjustly enriched. *Id.*

The ordinary measure of damages for breach of contract is the expected value of the contract had no breach occurred. In other words, damages should equal "the monetary value of what the promisee would have made if the contract had been performed, less the proper deductions." *Rowan Const. Corp. v. Hassane*, 17 Conn. App. 71, 80 (1988), *aff'd*, 213 Conn. 337 (1990). "The award of damages in such a case is designed to place the injured party, so far as can be done by money, in the same position in which he would have been had there been no breach." *Id.* Vesta's claimed damages reflect that calculation. However, in the case of a breach of a lease agreement, a landlord who elects to terminate a tenancy when notified of the tenant's intent to

breach the lease is under the obligation to mitigate its damages, for example by re-renting the property. The Connecticut Supreme Court explains:

> When the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender. When the landlord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages. When the landlord elects to terminate the tenancy, however, the action is one for breach of contract and, when the tenancy is terminated, the landlord is obliged to mitigate his damages.

*AGW Sono Partners, LLC v. Downtown Soho, LLC,* 343 Conn. 309, 340-41 (2022) (cleaned up).

The landlord's duty to mitigate its damages only requires *reasonable* efforts to mitigate damages, and does not require the landlord to "sacrifice any substantial right of its own" or to "exalt the interests of the tenant above its own." *Danpar Assocs. v. Somersville Mills Sales Room, Inc*., 182 Conn. 444, 446 (1980). The question whether a landlord's efforts to mitigate its damages were reasonable is "a question of fact for the trier." *Brennan Associates v. OBGYN Specialty Group., P.C*., 127 Conn. App. 746, 754 (2011). "[I]n assessing the reasonableness of the landlord's efforts to mitigate damages the trier may consider whether the landlord was justified in refusing to rent the demised premises to a prospective tenant who was otherwise satisfactory and who would have put him in at least as good a position as if the original contract had been fully performed." *Danpar*, 182 Conn. at 446. The burden of proving a landlord's failure to mitigate damages is on the tenant. *AGW*, 343 Conn. at 345 ("[W]hen a tenant has breached a lease agreement, that tenant bears the burden of proving that the landlord failed to undertake commercially reasonable efforts to mitigate its damages.").

Ordinarily, a landlord's duty to mitigate its damages is satisfied by taking reasonable efforts to re-let the property. *See, e.g., Brennan Assocs.*, 127 Conn. App. 746. When a landlord pursues more lucrative uses of the property to the exclusion of reasonable rental opportunities, many courts hold that the landlord has failed to mitigate. For example, discussing a landlord's

decision to turn down prospective tenants and hold out for a higher-paying tenant, the Supreme

Court of Vermont has explained that:

> The issue is not whether landlord's conduct was sound from a business perspective or in hindsight. The issue is whether, having made the decision to refuse to entertain a prospective tenant and to pursue a [higher-paying] tenant, the landlord can charge the abandoning tenant with the risk and cost of its decision. We agree with the trial court's conclusion that landlord cannot impose the cost of its decision on the breaching tenant and recover rent for the waiting period from tenant.

*O'Brien v. Black*, 162 Vt. 448, 455 (1994). Other courts, including one lower court in

Connecticut, have similarly held that a landlord who only offers a property for sale, and does not

make any efforts to re-let a property in the interim, has not mitigated its damages. *See, e.g., In re*

*Blondheim Modular Mfg., Inc.*, 65 B.R. 856, 860-62 (Bankr. D.N.H. 1986); *Harmon v. Callahan*,

214 Ill. App. 104 (Ill. App. Ct. 1919); *Wilson v. Ruhl*, 277 Md. 607, 612 (1976); *Goula v.*

*Martinez*, 1984 WL 255760, at *2 (Conn. Super. Ct. Feb. 21, 1984).[1]

I am convinced that the reasoning of those cases comports with Connecticut law,

notwithstanding that the Connecticut Supreme Court has not yet answered the question whether

offering a property only for sale and not for lease constitutes mitigation. "Reasonable efforts" to

mitigate damages for breach of a lease have been defined under Connecticut law as offering a

property for rent for "the same rent the defendant was paying or less." *Thorne v. Broccoli*, 39

Conn. Supp. 289, 292 (Super. Ct. 1984). When a landlord abandons all efforts to re-let a property

in favor of marketing a property for sale, it may expect that the sale value will be much higher

---

[1] In its post-trial reply brief, Vesta cites a handful of cases from other states that have held the opposite: that a landlord may mitigate its damages by making commercially reasonable efforts to sell the property. *See* Doc. No. 177, at 4 (citing *Hand Cut Steaks Acquisitions, Inc. v. Lone Star Steakhouse & Saloon of Nebraska, Inc.*, 298 Neb. 705 (2018); *Tech Ctr. 2000, LLC v. Zrii, LLC*, 363 P.3d 566 (Utah Ct. App. 2015); *Krasne v. Tedeschi & Grasso*, 436 Mass. 103 (2002)). Those out-of-state cases are obviously not binding on this Court, and, in light of the contrary cases just cited, do not appear to reflect the "weight of authority across the country," but rather the existence of a split of authority. *Id.*

than the rent that the breaching tenant was paying, but it also must know that doing so could result in a long period of vacancy. If the landlord takes that course of action, it has not taken reasonable efforts to mitigate its loss of rental income in the period between the former tenant's breach and the sale.

Here, it is uncontested that Vesta elected to terminate ELX's tenancy immediately upon ELX's breach, and therefore Vesta had a duty to mitigate its damages. *See* Possession Agreement, Ex. 5. Based on the evidence presented at the bench trial, I conclude that ELX has met its burden to prove that Vesta did not make reasonable efforts to mitigate its loss of rental income.[2] Instead, despite never contending the it *couldn't* re-lease the Property, Vesta focused entirely on pursuing opportunities to sell the property for redevelopment.

In fact, long before ELX notified Vesta of its intent to vacate the Property, Vesta expressed in explicit terms that it purchased the Property with the intent to sell or redevelop it, and expected that ELX would vacate before the termination of its lease. *See* Ex. 201. Then, when ELX did notify Vesta of its intent to vacate, Vesta immediately began working with sales brokers

---

[2] Vesta argues that ELX did not meet its burden to prove a lack of mitigation because it did not offer any expert testimony to establish "the standard by which to measure the commercial reasonableness of [Vesta's] efforts." *See* Pl.'s Reply Br., Doc. No. 177, at 2. But despite bearing the burden to prove a landlord's failure to mitigate its damages, the Connecticut Supreme Court is clear that, "the defendant could well establish failure of mitigation through cross-examination of the plaintiff and its witnesses." *AGW Sono Partners*, 343 Conn. at 345. In some cases, the testimony of an expert witness may assist the trier of fact in determining the "commercial reasonableness" of a landlord's efforts to re-rent a property. *See, e.g., Union Square Southbury, LLC v. Accommodations Unlimited, Inc.*, 2013 WL 6133047 at *4 (Conn. Super. Ct. Oct. 31, 2013) (holding that the defendants did not meet their burden of proving a landlord's failure to mitigate in part because "[t]he defendants provided no witness to establish that the rate at which the plaintiff has offered to rent the premises is not commercially reasonable."). However, in this case ELX could—and did—prove Vesta's failure to undertake *any* efforts to re-rent the Property at all through documentary evidence and cross-examination of Vesta's representative. In such a circumstance, expert testimony would not aid the trier of fact in determining any material issue. ELX's failure to call its own witnesses therefore does not compel the conclusion that ELX has failed to meet its burden to prove a lack of mitigation.

and architects to market the property for sale. Those efforts included developing marketing materials that solely emphasized the Property's potential for redevelopment as residential, and publicly filing an application for site plan approval that stated that the buildings on the Property were dilapidated and would be demolished. *See* Exs. 203, 204, 206. Finally, Vesta entered into four transactions for the sale of the Property with potential purchasers, each of which prevented Vesta from leasing the Property while it was in effect, *see* exs. 10-13, while neglecting any opportunity to re-lease the property. Vesta never placed a "for lease" sign on the Property, did not formally hire a broker to solicit leasing inquiries or post a lease listing online until over two years after ELX's breach, did not follow up on leasing inquiries that it did receive, and only forwarded to its leasing broker the same marketing materials that it developed to advertise the property for sale for redevelopment. *See* Exs. 9, 210-214.

Vesta's decision to try to sell, instead of re-lease, the Property may have been economically reasonable. Each purchase and sale agreement, including the one in effect today, was for almost double the price Vesta paid to purchase the property. *See* Deposition Tr., Ex. 225, at 21:16-17 (stating that Vesta purchased the Property from ELX for $3.25 million); Purchase and Sale Agreements, Exs. 10-13 (listing purchase prices of $5.85 million, $6.37 million, $6 million, and $6 million, respectively, for the Property). Those efforts, however, were clearly undertaken to the exclusion of any efforts to re-lease the property and thus do not satisfy Vesta's obligation to mitigate its lost rental income. Vesta therefore cannot recover from ELX any of the future rent or other expenses due under the Lease after it was terminated in January 2021.

Vesta also claims as damages the cleanup costs it incurred to remove items left by ELX after ELX abandoned the property. But those costs—for rental of a forklift, removal of environmentally hazardous substances, and disposal of items—cannot be recovered as damages

because Vesta took possession of all personal property left at the Property by ELX. Under the

Lease, Vesta had the option of either taking possession of personal property left by ELX *or*

removing the property at the expense of ELX:

> If Tenant shall fail to remove any of Tenant's moveable personal property at the Demised
> Premises, such property shall, at the option of Landlord, either be deemed abandoned and
> become the exclusive property of Landlord, or Landlord shall have the right to remove
> and store such property, at the expense of Tenant, and hold Tenant responsible for any
> and all charges and expenses incurred by Landlord therefore.

Lease Agreement, Ex. 1, at Art. 14. The terms of the Possession Agreement clearly indicate that

Vesta chose the former option, stating that "any property left at the Premises (inside or outside)

shall be deemed abandoned by [ELX] without claim or value, and Vesta can dispose of the

property as it sees fit in its sole and exclusive discretion." *See* Possession Agreement, Ex. 5, at

¶ 4(b). *See also* Trial Tr., at 163:4-170:22. Therefore, because all items left at the Property by

ELX had become the property of Vesta under the Possession Agreement, the costs associated

with the removal and disposal of those items cannot be recovered from ELX.

   In summary, Vesta cannot recover damages for any unpaid rent and expenses due under

the Lease or for any clean-up costs after it terminated ELX's tenancy and took possession of all

abandoned personal property by virtue of the Possession Agreement, signed on January 10, 2021.

The only damages that Vesta can recover from ELX are for unpaid rent and expenses that were

due prior to the Possession Agreement: January 2021 rent ($30,790.31), and a portion of the

January 2021 property tax bill covering the period before ELX's tenancy was terminated

($21,016.14). *See* Def.'s Post-Trial Br., Doc. No. 176, at 23-24. In addition, ELX does not

oppose Vesta's recovery of attorneys' fees associated with preparing the Possession Agreement

($2,962.50). *Id.* at 25. Those damages total $54,768.95—far less than the $175,000 in letter of

credit funds that Vesta was already paid by CIBC. *Id.* at 28.

Therefore, I conclude that Vesta has not suffered any damages recoverable from ELX for which it has not already been compensated.

### B. Unjust Enrichment

The only remaining claim that was tried is ELX's counterclaim for unjust enrichment. ELX claims that Vesta was overcompensated when it received $175,000 from the letter of credit funded by ELX pursuant to Section 6.01 of the Lease. *See* Answer and Counterclaim, Doc. No. 144, at 6-8. As detailed above, ELX alleges that Vesta can recover, at most, $54,768.95 in unpaid rent, expenses, and attorneys' fees, and claims that Vesta should be ordered to pay ELX the remainder of the letter of credit funds ($120,231.05). *See* Doc. No. 176, at 28.

A claim for unjust enrichment is an equitable claim, "its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282 (1994) (internal citations omitted). "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Id.* Unjust enrichment is, "consistent with the principles of equity, a broad and flexible remedy," and requires proof "(1) that the [cross-claim] defendants were benefited, (2) that the [cross-claim] defendants unjustly did not pay the [cross-claim] plaintiffs for the benefits, and (3) that the failure of payment was to the [cross-claim] plaintiffs' detriment." *Id.* at 283. Ordinarily, the existence of an express contract bars a claim for unjust enrichment, but the existence of a contract "does not preclude equitable relief which is not inconsistent with the contract." *Rent–A–PC, Inc. v. Rental Management, Inc*., 96 Conn. App. 600, 606 (2006).

Connecticut courts recognize claims of unjust enrichment in cases where a landlord improperly retains money paid as a form of security deposit by the tenant. *See, e.g., Fitzpatrick v. Scalzi,* 72 Conn. App. 779 (2002). That is essentially what ELX alleges occurred here. Article 6 of the Lease, titled "Security Deposit," required ELX to deliver to Vesta a letter of credit issued by a commercial bank in the amount of $175,000. *See* Ex. 1, at ¶ 6.01. ELX obtained that letter of credit from CIBC and, in January 2021, Vesta submitted a written request to CIBC for letter of credit funds and received the entire sum of the funds. *See* Trial Tr., Doc. No. 174, at 31:17-32:9; Ex. 202. As explained above, Vesta was overcompensated by the letter of credit funds CIBC paid to Vesta, because its recoverable damages were $120,231.05 less than the total $175,000 of letter of credit funds it received. However, Vesta argues that because the funds were paid to Vesta by CIBC, not ELX, ELX's unjust enrichment claim is "nonsensical." *See* Pl.'s Post-Trial Br., Doc. No. 175, at 14-15.

Vesta's argument is misplaced. As Vesta acknowledges in its brief, an unjust enrichment claim may be brought where there has been "a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit." *New Hartford v. Connecticut Resources Recovery Authority*, 291 Conn. 433, 468 (2009). When that is the case, "the plaintiff must prove that it has 'a better legal or equitable right' to the disputed benefit than the defendant." *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25 (2019) (citing 2 Restatement (Third), Restitution and Unjust Enrichment § 48, p. 144 (2011)). Here, the parties stipulated that ELX "funded" the letter of credit. *See* Stipulations of Fact, Doc. No. 168 at ¶ 12(A)(iii). That stipulation on its own may be somewhat ambiguous in that it does not conclusively tell us that the entire $175,000 was paid by ELX. Letter of credit arrangements may take different forms, sometimes but not always requiring the applicant to provide cash collateral to the issuing bank in

the full amount of the letter of credit. *See* Letter of Credit, Black's Law Dictionary (12th ed. 2024) (defining a letter of credit broadly as "[a]n instrument under which the issuer (usu. a bank), at a customer's request, agrees to honor a draft or other demand for payment made by a third party (the *beneficiary*). . . ."). *See also Armac Indus., Ltd. v. Citytrust,* 203 Conn. 394, 397-98 (1987) ("A letter of credit, under the [Uniform Commercial Code], is an engagement by a bank or other person, made at the request of a customer, that the issuer will honor drafts or other demands for payment upon compliance by the beneficiary with the conditions specified in the credit.") (citing Conn. Gen. Stat. § 42a–5–103(1)(a)). To be sure, it would have been helpful to know the terms of ELX's agreement with CIBC to issue the letter of credit, but ELX's application agreement was not provided as an exhibit.[3] The letter of credit itself, however, was provided as an exhibit, and states, "we hereby issue our irrevocable standby letter of credit . . . in favor of [Vesta], as beneficiary, for the account of [ELX], which is available with us by payment

---

[3] A letter of credit transaction typically, as here, contains three relationships. Those relationships are "(1) between the issuer and the beneficiary; (2) between the beneficiary and the account party; and (3) between the account party and the issuer. The first is the letter-of-credit engagement. The second is usually called the underlying contract, and the third is called the application agreement." Letter of Credit, Black's Law Dictionary (12th ed. 2024) (quoting John F. Dolan, *The Law of Letters of Credit* ¶ 2.01, at 2–2 (1984)). Under the Uniform Commercial Code, adopted into Connecticut law, those relationships are entirely independent contracts. *See* Conn. Gen. Stat. § 42a-5-103(d) ("Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

 The only documentary evidence that ELX has provided pertaining to the letter of credit arrangement is the letter of credit itself and Vesta's demand for funds under it, dated January 21, 2021. *See* Ex. 200. The letter of credit does not indicate the precise terms of ELX's application agreement, nor does CIBC's payment of the entire $175,000 to Vesta conclusively establish that ELX had actually paid CIBC that entire sum of money. The issuer of a letter of credit is obligated to honor a beneficiary's demand for payment as long as the demand conforms to the requirements of the letter of credit, regardless of the terms of the underlying contract(s). *See New York Life Ins. Co. v. Hartford Nat'l Bank & Tr. Co.*, 173 Conn. 492, 499 (1977).

for up to an aggregate amount of $175,000." *See* Ex. 200. The Lease Agreement also states that if Vesta were to obtain funds under the letter of credit and then receive a replacement letter of credit, "that portion, if any, of the cash security not used or applied . . . shall be returned to [ELX]." Lease Agreement, Ex. 1, at ¶ 6.01(b). On the basis of those descriptions and the parties' stipulation, it appears more likely than not in this case that ELX did provide cash collateral to CIBC in order to obtain the letter of credit, and that the money paid to Vesta came from that collateral account. Therefore, I conclude that ELX has met its burden of proving by a preponderance of the evidence that the letter of credit funds paid to Vesta were, though paid indirectly, its own funds, and thus that ELX suffered a detriment in the amount that Vesta was overpaid.

Finally, ELX's claim for unjust enrichment is not barred by the existence of a contract, i.e., the Lease Agreement, because allowing ELX to recover from Vesta the amount it was overcompensated by the letter of credit funds is not inconsistent with the terms of the Lease Agreement. *See Rent–A–PC*, 96 Conn. App. at 606. As ELX points out, the Lease Agreement does *not* indicate that the letter of credit funds are liquidated damages, the full amount of which Vesta could keep in the event of ELX's default, regardless of the amount of Vesta's actual damages. *See* Doc. No. 178, at 8; Lease Agreement, Ex. 1, at Art. 6. On the contrary, the article of the Lease Agreement describing the letter of credit is titled "Security Deposit," and states that if ELX defaults Vesta can require the issuing bank only to pay "the amount in default or otherwise owed to [Vesta]." Ex. 1, at ¶ 6.01(a)(i). The Lease Agreement also does not specify some other remedy for the return of letter of credit funds paid to Vesta that exceed Vesta's damages. *Id.* "[W]hen an express contract does not fully address a subject, a court of equity may

impose a remedy to further the ends of justice." *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 455 (2009) (internal citations omitted).

I thus conclude that ELX has met its burden of proving its counterclaim for unjust enrichment.

### C.  Attorneys' Fees

Finally, Vesta seeks an award of attorneys' fees pursuant to Article 12.02(f) of the Lease. That provision of the Lease states:

> If Tenant shall be in default in the performance or observance of any of its obligations under this Lease, or if Tenant shall fail to surrender the Premises upon the expiration or earlier termination of this Lease, Tenant shall pay to Landlord all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Landlord in pursuing its legal or equitable remedies.

Ex. 1, at ¶ 12.02(f). Vesta states that it "reserves the right to seek additional attorneys' fees following judgment." *See* Doc. No. 177, at 10. Pursuant to Federal Rule of Civil Procedure 54(d)(2)(A), however, any fees Vesta seeks under the Lease must have been proven at trial, and cannot be awarded through a post-judgment motion.

Federal Rule of Civil Procedure 54 states that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). The official commentary to Rule 54(d) explains that attorneys' fees "recoverable as an element of damages, as when sought under the terms of a contract" are typically "claimed in a pleading and may involve issues to be resolved by a jury." Fed. R. Civ. P. 54(d)(2)(A), Advisory Committee Notes, 1993 Amendment. The Second Circuit, considering that commentary, explicitly held that a parties' entitlement to contractual attorneys' fees must be decided by the trier of fact. *Town of Poughkeepsie v. Espie,* 221 F. App'x 61, 62 (2d Cir. 2007). *See also 405 Sullivan Ave. Indus.*

*LLC v. Kuhns Fam. Properties, LLC*, 2023 WL 4491745, at \*6 (D. Conn. July 12, 2023) ("Kuhns' claim for attorneys' fees pursuant to the terms of the contract may be raised in its pleading and proven at trial rather than in a post-judgment motion, and, indeed, it is possible that Kuhns will not be able to seek attorneys' fees if raised only in a post-judgment motion.").

On the basis of the evidence presented at the bench trial, I conclude that Vesta has failed to prove its entitlement to attorneys' fees under the Lease for any fees and costs incurred after the parties entered into the Possession Agreement. ELX argues that, by extensively redacting its billing records, *see* ex. 16, Vesta did not provide information sufficient to establish the reasonableness of its fees. *See* Def.'s Post-Trial Br., Doc. No. 176, at 26. But I reject Vesta's claim for attorneys' fees and costs associated with this litigation for a more basic reason. The provision of the Lease governing attorneys' fees states that Vesta can recover attorneys' fees from ELX "[i]f [ELX] shall be in default in the performance or observance of any of its obligations under this Lease, or if [ELX] shall fail to surrender the Premises upon the expiration or earlier termination of this Lease." Lease Agreement, Ex. 1, at ¶ 12.02(f). Vesta neither alleged nor proved that ELX failed to surrender the Premises after the termination of the Lease. And though it is uncontested that ELX did default on its obligations under the Lease when it notified Vesta of its intent to vacate the premises on December 31, 2020 and failed to pay rent for January 2021, *see* ex. 3, by entering into the Possession Agreement on January 10, 2021, the parties terminated the Lease. *See* Possession Agreement, Ex. 5, at ¶ 3 ("The Parties agree that the Lease has been fully terminated as of the date of this Agreement."). The plain terms of the Lease and Possession Agreement thus foreclose Vesta's claim for attorneys' fees incurred after January 10, 2021, because after that point the Lease was terminated and ELX was no longer "in default."

That conclusion comports with Connecticut law regarding the rights and obligations of a landlord and tenant after the termination of a lease. It is well established that, after termination of a lease, a tenant is no longer obligated to make monthly rental payments and the landlord cannot sue to recover rent due under the terms of the lease. *See Southhaven Assocs., LLC v. McMerlin, LLC*, 159 Conn. App. 1, 11 (2015). Instead, the landlord may sue for breach of contract and the amount of remaining rent due under the lease is only relevant insofar as it can be used as evidence of the damages that the landlord sustained. *Id.*; *see also Rokalor, Inc. v. Connecticut Eating Enterprises, Inc*., 18 Conn. App. 384, 389 (1989) ("Although the termination of the tenancy releases a tenant from his obligations under the lease . . . unpaid rent, while not recoverable as such, may be used by the court in computing the losses suffered by the plaintiff by reason of the defendant's breach of contract of lease."). It follows that once a landlord elects to terminate a tenancy, it may not sue to enforce any other contractual obligations of the tenant under the lease, including the obligation to pay the landlord's attorneys' fees.

Therefore, I conclude that Vesta is not entitled under the Lease to recover attorneys' fees and costs incurred in connection with litigating this action against ELX for breach of contract, because all of those fees and expenses were incurred after the Lease had been terminated. In other words, I conclude that Vesta can only recover from ELX its attorneys' fees associated with preparing the Possession Agreement, which ELX does not dispute. *See* Doc. No. 176, at 25.

## V.    Conclusion

Accordingly, for the reasons discussed above, I conclude that Vesta failed to prove by a preponderance of the evidence that it suffered any damages from ELX's breach of the Lease for which Vesta has not already been compensated. I also conclude that ELX proved by a

preponderance of the evidence that Vesta was unjustly enriched to ELX's detriment, in the amount that it was overcompensated by the letter of credit funds paid to Vesta by CIBC.

Judgment shall therefore enter for Vesta on its claims for breach of contract in the amount of **$54,768.95**, which judgment has already been satisfied. Judgment shall enter for ELX on its counterclaim for unjust enrichment, in the amount of **$120,231.05**.

The clerk is directed to enter judgment and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 1st day of November 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge